]UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DAT PHAM,

               Petitioner                      **DECISION AND ORDER**
      -vs-                                       No. 03-CV-0096(VEB)

JOHN BEAVER, Superintendent, Orleans
Correctional Facility,

               Respondent.
_____

## I. Introduction

Dat Pham ("Pham"), proceeding *pro se*, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction following a jury trial in New York State Supreme Court (Monroe County) on charges of burglary and robbery. The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(c).

## II. Factual Background and Procedural History

Pham's conviction stems from his alleged involvement in the burglary and robbery of a Vietnamese couple at their home in the City of Rochester on the night of January 19, 1998. Thanh Le ("Le") testified through an interpreter that on the evening in question, she had been at an acquaintance's house on Fulton Avenue. T.153.[1] There was a group of people there, and they were playing cards and gambling. T.164. Le had about $5,300 in cash; this money had been paid to her by members of the Vietnamese community in Rochester in return for purchasing airplane tickets to Vietnam for them. T.154. A woman named Quy Ho ("Ho") gave Le a check for $78

---

[1] Citations to "T.___" refer to the trial transcript.

that had Dat Pham's name as the payee on it and was endorsed as "Pham Dat"[2] on the back of the check. Ho asked Le to cash it. T.162-63, 176. Le testified that she had known Ho for nine years, and so Le agreed to cash the check. T.172. Le testified that as she opened her wallet to take out the money, Ho was sitting right next to her and could see her purse. T.165. After losing that money gambling, Ho asked Le to loan her an additional $100. T.164.

Shortly after 11 p.m., Le left the house at Fulton Avenue, dropping Ho off at an address on Emerson Street. T.166. Le then returned home to Perinton Street where her husband Thang Nguyen ("Nguyen") was sitting in the kitchen eating dinner after returning home from his job at the post office at about 11:30 p.m. As Le was sitting at the table counting her money, someone knocked on the door. Le testified that this made her "nervous" and she asked Nguyen not to open the door. T.167, 220.

Nguyen testified that he went to the door, looked outside, and opened the door anyway because he saw that the visitors were Vietnamese. T.216. At trial, Nguyen identified Pham as the person who was at the door. T.220 Nguyen testified that he could see who was at the door because there were lights on in the kitchen and that there was a light outside the door, which also was on. T.217. Nguyen testified that Pham's face was "very easy to memorize because he got a mole on his face." T.220. He admitted that in his statement to the police, he did not mention that the person who knocked on the door had a facial mole. T.243. Nguyen testified that he thought he had done so, and stated that one of the police officers specifically asked him if the perpetrator hand a mole or a scar. T.245-46. The police officer testified that Nguyen had not said anything

---

[2] The witnesses at trial testified that it is customary in Vietnamese to put the first name last and the surname first when signing one's name.

about the perpetrator having moles or scars when he was asked that in the course of the officer taking a statement. T.309.

Nguyen testified that he had not met Pham before, but that he knew Ho. T.233. Nguyen stated that there were two other men with Pham. *Id.* Pham said, "Chau" to Nguyen, which "means like hi to an uncle in America." T.221. Pham then punched Nguyen in the chest and face, causing him to fall to the floor. T.222. Nguyen tried to get away, but the men punched him until he "was exhausted" and he told them "that was enough." T.224. Then the men walked Nguyen into the house while displaying a long, silver knife. T.225.

Meanwhile, one of the intruders kicked Le, who was five-months pregnant, causing her to fall to the ground. T.167-68. Le did not get a look at any of the perpetrators' faces and, in fact, tried to avoid identifying them out of fear of reprisals. T.168. The intruders tied Le and Nguyen up in the hallway and proceeded to ransack their house, stealing their jewelry out of the bedroom and the cash that Le had been counting prior to the intrusion. T.226. The men left after about fifteen minutes. *Id.*

The human resources manager at the Hickey-Freeman Company testified that Pham had submitted an application for employment there on January 6, 1998. T.286. The application indicated that Pham had moved to Rochester from Georgia about five weeks previously and needed employment because his wife was pregnant. T.288. Pham's employment with the company commenced on January 8, 1998. However, Pham did not appear for work on January 19, 1998. T.290. On January 22, 1998, when Pham still had failed to appear for work, his job was deemed abandoned. T.292. While he was employed, Pham had not made any request for vacation time. *Id.*

Hiep Pham ("Hiep") testified for the defense that Pham had married her daughter, Quy Ho. T.320. Pham left their house on Emerson Street on Sunday, January 18, 1998, at about 10 p.m., with luggage, because he was going to Atlanta for a "ceremony of forty-nine day [*sic*] of his parents." T.330. According to the translated testimony of Hiep, in Vietnam, after one's parents die, all of the family has to come together and pray for them for forty-nine days. T.331. Pham returned to Hiep's house about ten days after he left. *Id.*

Pham's wife, Ho, testified for the defense that Pham left for Atlanta on Friday, January 16, 1998. She testified that while he was gone, he called her from Ohio, and she told him that the police were looking for him. T.342. Once Pham returned home about ten days later, he called the police several times. The officers came to talk to him on Tuesday and took him into the police station. T.343. On cross-examination, Ho stated that Pham told her that he had gone gambling at the casino while he was away and had won some money. When he returned home he showed her the cash he had won and a red car he had bought. T.345.

Tien Tran ("Tran") testified for the defense that he lived on South Avenue in Rochester and that Pham was his neighbor. He stated that on January 19, 1998, he was living in Atlanta. T.352. At about 11 p.m., Pham came to his house in Atlanta and they had a brief conversation about two stereo speakers. T.354. On cross-examination, Tran testified that he did not attend any religious ceremony with Pham in Atlanta and that he and Pham were not "close friend[s]." *Id.* He explained that he was first contacted by the defense about testifying about seven months after the incident, in July. When asked how he remembered the date of their brief meeting, Tran said that it was because it occurred on the Martin Luther King holiday.

Pham testified in his own behalf at trial that his father died in October 1997 and his

mother died in December of 1997. T.358. He testified that it is Vietnamese tradition to hold a funeral ceremony seven weeks after one's parents die.[3] T.359. Pham testified that he left Rochester on Sunday, January 18, 1998, at about 10 p.m. to drive down to Atlanta. T.360. On cross-examination, he admitted that when he was at work on Friday, January 16, he did not ask for time off to attend the religious ceremony because he had not quite decided whether he was going to Atlanta. T.179. He stated that he was going to call into work when he got to Atlanta and ask for time off.

He testified that he went to Tran's house to pick up two stereo speakers for his brother-in-law while he was in Atlanta. T.361. Pham stated that he stayed in Atlanta for four or five days and stopped in Ohio on his way back to Rochester. T.361-62. He testified that he did not return to work at Hickey-Freeman because he decided that he was going to move to Columbus, Ohio where he had friends, although he admitted that he had not told his wife, who was pregnant, about his plan. *Id.* Pham related that while he was in Ohio, he looked for work and went to the casino on one occasion. T.363. The defense introduced into evidence several receipts dated January 29, 1998, indicating that Pham had won $1,800, $3,600, and $12,500 at the casino. The receipts bore Pham's name and Social Security number; the address listed was his old address from three years ago. T.365-66. Finally, the defense introduced a photograph of Pham standing next to the slot machine out of which he had won the money. T.367.

The assault charges against Pham were dismissed before the case was submitted to the jury. The jury returned a verdict convicting Pham on the remaining charges (two counts of first

---

[3] It is not clear whether the Vietnamese funeral service to which the witnesses are referring actually lasts for forty-nine days or occurs forty-nine days (seven weeks) after the death of one's parents.

degree burglary and one count of first degree robbery). He was sentenced to concurrent sentences, the longest of which was ten to twenty years in prison.

The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed his conviction. *People v. Pham*, 283 A.D.2d 952, 725 N.Y.S.2d 245 (App. Div. 4th Dept. 2001). The New York Court of Appeals denied leave to appeal. *People v. Pham*, 96 N.Y.2d 900, 756 N.E.2d 85, 730 N.Y.S.2d 797 (N.Y. 2001). Pham collaterally attacked his sentence by means of a motion to vacate the judgment under New York Criminal Procedure Law § 440.20. The trial court denied this motion, and the Appellate Division denied leave to appeal.

This habeas petition followed. For the reasons set forth below, Pham's request for a writ of habeas corpus is denied.

**III.    Analysis of the Petition**

   **A.    Inadequacy of court-appointed interpreter**

The Supreme Court has never decided what degree of interpretive assistance is constitutionally required for non-English speaking defendants. *See United States v. Deist*, 384 F.2d 889, 901 (2d Cir. 1967) (noting lack of Supreme Court precedent); *see also United States v. Johnson*, 248 F.3d 655, 663 (7th Cir.2001) (noting that the Supreme Court has not even specifically found a constitutional right to any interpreter at all). The Second Circuit, however, has held that a non-English speaking defendant has a constitutional right to an interpreter. *See United States ex rel. Negron v. New York*, 434 F.2d 386, 387 (2d Cir. 1970); *see also United States v. Lim*, 794 F.2d 469, 470 (9th Cir. 1986) (holding that "a defendant whose fluency in English is so impaired that it interferes with his right to confrontation or his capacity, as a witness, to understand or respond to questions has a constitutional right to an interpreter")

(citations omitted); *accord*, *e.g.*, *Sin v. Fischer*, No. 01CIV.9376(GEL), 2002 WL 1751351, at *2 (S.D.N.Y. July 26, 2002).

In *Negron*, the Second Circuit noted that it was a "nearly self-evident proposition that an indigent defendant who could speak and understand no English would have a right to have his trial proceedings translated so as to permit him to participate effectively in his own defense." 434 F.2d at 389. The *Negron* court added that "[i]t is axiomatic that the Sixth Amendment's guarantee of a right to be confronted with adverse witnesses . . . includes the right to cross-examine those witnesses as an 'an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.'" *Id.* at 389 (citations omitted).

At Pham's trial there were two interpreters: an interpreter provided by the public defender's office to interpret for petitioner and an interpreter provided by the court to interpret for the court, the witnesses, and the jury. Pham's interpreter (Ms. Vu) was board-certified to testify in a court proceeding. However, the court-appointed interpreter (Mr. Doan) was relatively inexperienced, having never testified at felony trial before, although he had been interpreting in Buffalo City Court. Also, Doan was not board-certified. Pham contends that soon after the trial commenced, it became apparent that Doan was deficient, as evidenced by defense counsel's many objections, including that the court interpreter was mistranslating the witness Le's answers and was providing additional information to the witness instead of strictly interpreting the questions asked and the answers given. The trial court overruled defense counsel's objections, denied his request for a mistrial, ordered the prosecution to proceed, and instructed the court interpreter to "just repeat the questions and answers." T.168. However, according to Pham, the interpreter ignored the court's instructions, causing defense counsel to object repeatedly with the

aid of Pham's personal interpreter. During the testimony of a defense witness, the prosecutor also complained about the court interpreter's manner of interpretation; the trial court reminded the interpreter to state what the witness said, word for word, and not to paraphrase. The transcript indicates that errors complained of by defense counsel were corrected on the record, and the prosecutor asked follow-up questions in order to clarify the record.

After defense counsel continued to object to the court interpreter's manner of interpreting, the trial court ordered a recess and spoke with counsel in chambers. Thereafter, the trial court had the petitioner's interpreter switch roles with the court interpreter, and the trial continued with the court interpreter acting as Pham's personal interpreter. Defense counsel agreed to this arrangement, and noted that if Pham had any questions for him, Pham would write them down in Vietnamese and show them to the interpreter who would translate them for counsel. *See* T.323-29.

Pham contends the trial court's remedy (switching the interpreters' roles) deprived him of his right to due process, to the effective assistance of counsel, and to confront and cross-examine witnesses. Pham asserts that requiring an "incompetent" interpreter to interpret between him and his attorney effectively deprived him of the assistance of counsel and the right to participate in his own defense. However, neither defense counsel nor Pham ever complained that they were not able to communicate with or understand each other.

As to the claim that he was denied his right to confront witnesses, Pham has not pointed to any errors in translation that were left uncorrected. He concedes that "[o]n each occasion" that defense counsel objected to the incorrect translation, either the district attorney corrected the mistake by asking follow-up questions or the trial court instructed the jurors regarding the

incorrect translation. *See* Petitioner's Appellate Brief at 17, Resp't App. C at 23. Pham also points out that the court translator was engaging in un-transcribed conversations with several of the witnesses, to which defense counsel and the district attorney objected. This was improper, but the trial court took curative measures by instructing the court interpreter to refrain from conversing with the witnesses, and ultimately had Pham's personal interpreter interpret for the witnesses instead. The Court notes that there apparently were no complaints regarding the translations after the switch was made.

The Court agrees that, initially, there certainly was a problem with the court translator. However, the Court has reviewed the entire trial transcript and could not find any instances of translation errors that were brought to the trial court's attention but went uncorrected. Rather, it appears to the Court that incorrect or inaccurate testimony was promptly corrected for the jury. In the end, the more qualified translator took over the role of interpreting the witnesses' testimony for the benefit the jury, the court, and the attorneys. Thus, the Court cannot see how Pham suffered constitutional prejudice as a result. Habeas relief will not issue on this claim.

### B.     Prosecutorial misconduct

When asking for pedigree information from victim/witness Thang Nguyen, the prosecutor inquired as to whether he was married, where he worked, and what his religion was. Over defense counsel's objection, Nguyen answered that was Roman Catholic. T.214-15. During summation, when discussing Nguyen's credibility, the prosecutor commented that the witness "came to this courtroom, walked in this courtroom, took the stand, Roman Catholic, took an oath to tell you the truth." T.422. On direct appeal, the appellate division agreed that the prosecutor "engaged in misconduct when he questioned [Nguyen] about his religious affiliation and made

reference to that religious affiliation during summation[.]" *People v. Pham*, 283 A.D.2d at 952 (citation omitted). The court "strongly condemn[ed] that misconduct," but found that it did "not warrant reversal" in Pham's case. *Id.* (citation omitted).

The habeas court's scope of review as to claims of prosecutorial misconduct is quite limited. In order to overturn a conviction, the Court would have to find that the prosecutor's comments constituted more than mere trial error and instead were so egregious as to violate the petitioner's due process rights. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 647-48 (1974); *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990) ("The appropriate standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power.") (internal quotation marks and citations omitted); *accord Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998).

Thus, to be entitled to relief, Pham must show that he "'suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict.'" *Tankleff*, 135 F.3d at 252 (quoting *Bentley v. Scully*, 41 F.3d 818, 823 (2d Cir. 1994) (internal quotation marks and citation omitted in original)). "Rarely are comments in a prosecutor's summation 'so prejudicial that a new trial is required.'" *United States v. Germosen*, 139 F.3d 120, 128 (2d Cir. 1998) (quoting *United States v. Forlorma*, 94 F.3d 91, 93 (2d Cir. 1996) (quotations omitted)), *cert. denied*, 525 U.S. 1083 (1999). Reversal of a defendant's conviction is warranted only where "'the statements, viewed against the entire argument before the jury, deprived the defendant of a fair trial.'" *Id.* (quoting *Forlorma*, 94 F.3d at 94). In determining whether a defendant has suffered actual prejudice as a result of the prosecutorial misconduct, the reviewing court considers "'the severity of the misconduct; the

measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements.'" *Floyd*, 907 F.2d at 355 (quoting *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir.1981) (*per curiam*)); *accord*, *e.g.*, *Germosen*, 139 F.3d at 128; *United States v. Miller*, 116 F.3d 641, 683 (2d Cir. 1997).

With respect to the severity of the misconduct, it is highly improper for the prosecutor to attempt to bolster a witness's credibility on the basis that he subscribes to a particular religion, or to suggest that a witness is more credible simply because he is religious. It appears that the prosecutor's misconduct was confined to these two instances during the trial.

The Court next considers the evidence of the petitioner's guilt. As the Second Circuit has noted, "[o]ften, the existence of substantial prejudice turns upon the strength of the government's case: if proof of guilt is strong, then the prejudicial effect of the comments tends to be deemed insubstantial; if proof of guilt is weak, then improper statements are more likely to result in reversal." *Modica*, 663 F.2d at 1181. Here, the proof of Pham's guilt was certainly sufficient to support the verdict against him, although the Court would not necessarily characterize it as "overwhelming." Thus, this factor does not weigh heavily in favor of respondent.

Turning to the issue of whether curative measures were undertaken, the Court notes, with some dismay, that the trial court did not take the opportunity to curb the prosecutor's irrelevant inquiry into the witnesses' religion. That was error. However, defense counsel did not then object to the prosecutor's passing reference to the victim's religion during summation.

The Court agrees with the Appellate Division that the prosecutor's conduct in this case should be strongly condemned. However, the prosecutor did not make other objectionable remarks during his summation, and the trial, overall, was a fair and temperate proceeding. Furthermore, defense counsel did not object to the prosecutor's comment about the witness's

religion. The Second Circuit has instructed that where a defendant has failed to object to the prosecution's summation during trial, a new trial is warranted only where there was "flagrant abuse." *United States v. Zichettello*, 208 F.3d 72, 103 (2d Cir. 2000) (citation omitted). What occurred at Pham's trial was offensive but not technically "flagrant abuse." Stated another way, the prosecutor's comment was not so prejudicial as to have denied Pham a fair trial.

The Court is nevertheless deeply troubled by the prosecutor's reference to the witness's religion. This is a violation of such a fundamental principle that the Court is certain that the prosecutor's remark was deliberate. As the Second Circuit noted in *Modica*, "'The appellate tribunals have found to dismay that they cannot uphold a conviction and yet successfully condemn the method by which it was secured. Carefully written opinions condemning the indiscretion and misconduct have not been successful to curb improprieties. The very act of upholding the conviction has given prosecutors approval, and the "judicial slap on the wrist" has not deterred the prosecutor from his unethical and improper tactics.'" *Modica*, 663 F.2d at 1183 (quoting Note, Prosecutor Indiscretion: A Result of Political Influence, 34 IND.L.J. 477, 487 (1959)). The Second Circuit further observed that "[r]eversal is an ill-suited remedy for prosecutorial misconduct; it does not affect the prosecutor directly, but rather imposes upon society the cost of retrying an individual who was fairly convicted." *Modica*, 663 F.2d at 1184.

Because the Court is only sitting in collateral review of this matter, it does not have the jurisdiction to judicially sanction a prosecutor or issue contempt penalties against him. However, the Court will take this opportunity to admonish the prosecutor to carefully review New York state's evidentiary law, the Federal Rules of Evidence, the ABA Model Code of Professional Responsibility, the ABA Model Rules of Professional Conduct, and the ABA Standards for Criminal Justice so that he may familiarize himself with the proper manner in which to conduct

himself when prosecuting a case on behalf of the People of the State of New York.

      **C.**      **Inadequate jury instruction regarding the alibi defense**

Pham contends that the trial court's instruction to the jury regarding the alibi defense was deficient because it failed to include certain language from New York's pattern criminal jury instructions. On direct appeal, the appellate division found that the trial court had properly charged the jury on the alibi defense as a matter of state law. *People v. Pham*, 283 A.D.2d at 952 (citation omitted).

The adequacy of a court's instructions to a jury is normally a matter of state law. *See Cupp v. Naughten*, 414 U.S. 141, 146 (1973). Since habeas relief requires the petitioner to predicate his claims on a violation of the federal constitution, *see* 28 U.S.C. § 2254(a), Pham must show that the trial court's failure to give certain jury instructions violated some right which was guaranteed to him by the Fourteenth Amendment, *see Cupp*, 414 U.S. at 146. It is not sufficient to simply show that the court's omission in instructing the jury was erroneous under state law.

Furthermore, "the burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). Thus, the habeas petitioner faces a substantial hurdle and must show "not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant under the Fourteenth Amendment . . . [T]he question is not whether the trial court failed to isolate and cure a particular ailing instruction, but rather whether the ailing instruction by itself so infected the entire trial process that the resulting conviction violates due process." *Cupp v.*

*Naughten*, 414 U.S. at 146-47.

Fatal to Pham's claim is that the jury instruction was not even erroneous; the judge properly charged the jury in accordance with New York state law that the prosecution had to prove that Pham was the individual who committed the crimes and to disprove his alibi defense beyond a reasonable doubt. *See People v. Victor*, 62 N.Y.2d 374, 377-78, 465 N.E.2d 817 (N.Y. 1984) (stating that the prosecution has the "burden of disproving an alibi beyond a reasonable doubt, and a Judge must unequivocally state that burden in the jury charge"). Because Pham cannot demonstrate an error of state law, let alone an error of federal constitutional magnitude, habeas relief cannot issue on this claim.

### D. Illegality of sentence

Pham contends that the trial court failed to sentence him on each of the three counts for which he was convicted. In support of this argument, Pham cites two pages of the sentencing transcript in which the trial court pronounced sentence for what would appear to be only two of the three crimes of which Pham was convicted. The court stated, "Mr. Pham, based upon your conviction for the crimes of Burglary in the First Degree and Robbery in the First Degree . . . ." A review of the entire sentencing transcript shows that the court properly sentenced Pham, as convicted, on two counts of first degree burglary (N.Y. Penal Law § 140.30(2) (causes physical injury), (3) (uses or threatens the immediate use of a dangerous instrument) and one count of first degree robbery (N.Y. Penal Law § 160.15(3)). However, the trial court referred to the pertinent elements of all three crimes when discussing Pham's involvement in the incident before it pronounced sentence. The fact that the trial court merely referred to the two categories of crimes committed, rather than each applicable statutory section, does not mean that Pham was only sentenced to two crimes. Therefore, the Court cannot find any illegality in Pham's sentence.

In any event, even if the Court were to vacate Pham's sentence, the result would be re-sentencing to the exact same sentence originally imposed. This would be a pointless exercise and a waste of judicial resources.

**IV.     Conclusion**

For the reasons stated above, petitioner Dat Pham's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*
_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:   July 7, 2006
         Buffalo, New York.